AMERICAN COTTON COMPANY *v.* LEANDER W. HERRING.

1. SALES. *Contract. Breach by buyer. Remedy of seller.*

On the breach of a contract to purchase personal property the seller may:

(*a*) Complete the contract on his part, and sue for the contract price; or

(*b*) Treat the contract as ended, retain the property as his own, and sue for the difference between the market value and the contract price; or

(*c*) Sell the property at public or private sale for the best price he can obtain, and sue for the difference between the price realized and the contract price.

2. SAME. *Case. Measure of damages.*

Where by the terms of a contract defendant agreed to buy plaintiff's cotton during a season at an agreed sum per hundred pounds less than the market price of cotton in a certain city on the day of sale and the plaintiff tendered a designated number of bales when the market price in said city was 9 13-16 cents per pound, which the defendant refused to buy at that price, but offered to do so on the basis of 9 9-16 cents per pound as the city market price, which plaintiff declined, subsequently selling at 9 cents per pound, the measure of plaintiff's damages is not the difference between 9 and 9 13-16 cents per pound, but the difference between 9 9-16 and 9 13-16 cents per pound.

3. SAME.

Where defendant agreed to purchase all complainant's cotton during a season at twelve cents per one hundred pounds below the actual *bona fide* market value of the cotton in a warehouse at another place, and the agreement stated that the price would "ordinarily" be based on the last official quotation of the day, though defendant was not bound to adopt the closing quotations for the day as a basis by which to estimate the price which it would pay for the cotton, it could not, at any time, under the contract, compel complainant to take less than twelve cents per hundred pounds below the actual value of the cotton, whatever basis was adopted in arriving at that value.

4. SALES. *Waiver by seller.*

> Where defendant had agreed to take all of complainant's cotton during the season at a stipulated amount less than the actual market value of the cotton on the day on which it was sold, and on a certain day refused to pay complainant the contract price in accordance with the market quotation on that day, but thereafter complainant did not notify defendant that he intended to stand on his contract, but continued to treat the cotton as his own, and acted in accordance with a letter in which defendant repudiated the terms of its original agreement, he thereby waived his rights under the contract.

5. SAME. *Right to storage, insurance, etc.*

> Where complainant offered cotton for sale at a certain price, and defendant refused to take it, and complainant did not insist on the terms of a contract by which defendant was bound to take it at that price, but left the cotton in storage with defendant, treating it as his own, defendant was entitled to charge complainant storage, insurance, and interest on money advanced on the cotton left with him.

6. SAME.

> Where complainant directed the sale of cotton at nine cents, he waived his rights under a contract by which he was entitled to the actual *bona fide* market value of the cotton on the day of sale, and which, on the day of his order, was nine and one-eighth cents.

FROM the chancery court of Grenada county.

HON. JULIAN C. WILSON, Chancellor.

Herring, the appellee, was complainant, and the American Cotton Company, appellant, defendant in the court below. From a decree partly in complainant's favor the defendant appealed to the supreme court, and complainant prosecuted a cross-appeal. The facts are stated in the opinion of the court.

*W. A. Percy,* for appellant and cross-appellee.

So far as the cross-appeal is concerned, the chancellor, of course, was correct, as will be seen from the record. Herring himself offered to sell the five hundred bales of cotton at 9 cents, and the company paid 9 cents for it. There

was no duress or waiving of any rights, nor any complaint, and a settlement was had after the account sales were received, and after going over the accounts carefully the final balance as found due was paid, and that is an end of that.

It must be conceded that the theory upon which the original bill in this cause was filed—to wit, a sale and passage of title on December 5, 1900—cannot be sustained. Whether the American Cotton Company broke its contract with Herring or not in not purchasing on that day at the closing quotations, the fact remains that the title remained in Herring and that his cotton remained liable for storage and insurance charges, and he was liable for interest on the money advanced him on the cotton; so that in any view of the case the chancellor was wrong in rendering judgment for these items against the American Cotton Company. But the complainant's whole case turns upon the liability which the defendant incurred in refusing to take up the cotton according to contract; and while he sues upon the theory of an actual sale, which is not sustained by the proof, no doubt under his prayer for general relief he would be entitled to recover any damages occasioned him by the breach of the contract upon the part of the American Cotton Company unless the breach had been waived. So that the sole question for the court to determine is as to whether or not the right of action lies in favor of Herring for the refusal of the cotton company to pay him 9 13-16 cents for his cotton and offering him 9 9-16 cents, and if so, what is the measure of damages?

When the telegram of December 5th was received the cotton had not been delivered, at least only fifty-eight bales had been delivered, to the American Cotton Company, and immediately the American Cotton Company wired back that the cotton could not be accepted at closing quotations, but could only be accepted at 9 9-16.

The court below very properly stated that the delivery by the executory vendor of the cotton to the carrier, under such

circumstances, was no delivery to the vendee. Meacham on Sales, sec. 1092.

In view of the relationship between the parties, it is perfectly clear that after the receipt of the telegram from the American Cotton Company on December 5th, the 242 bales, when afterwards shipped, were therefore held by the American Cotton Company, as warehousemen, just as the 58 bales shipped in October were held; so that it was only a breach of an executory contract to sell, with the vendor retaining possession and control of the property. The extent of this breach was the difference between 9-16 and 13-16, the price to be paid. When the contract was thus broken, Herring had the right to treat the contract as at an end and bring his action for the breach of it, and in such action he would have been entitled to recover such damages as then arose from the non-performance of the contract, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss.

The measure of damages in such a case is the difference between the contract price and the market price at the time of the delivery. In the case under consideration the time of the breach and the time of the delivery were practically the same, and the measure of damages was the difference between the contract price and the true market price; but 9 13-16 was the market price, and, therefore, under the ordinary principles of law, it is a case of *damnum absque injuria*. But it is correctly maintained that there was no market price for this particular kind of cotton. In such a case the measure of damages is the difference between the contract price and the highest price obtainable, or, as it is stated in Meacham on Sales, par. 743, the actual value.

And this is the rule where the price is controlled by the trusts. *Id.,* par. 208. The highest price obtainable on the day of the breach was the offer of the American Cotton Company of 9 9-16, and it was the duty of the vendor to have sold

the property at the highest price obtainable, and to have held the American Cotton Company for the difference.

But before any damages could accrue from the breach two things were incumbent upon the executory vendor: First, to use due diligence in selling the property at its market value; second, to notify the vendee that such sale would be made. It has been held that "where after a buyer in a contract for the sale of seeds had refused to accept them, and the seller received and refused a *bona fide* responsible offer for the seeds at a higher price than that finally obtained, the sale was not made with due diligence." *Gell* v. *Milwaukee Produce Co.,* 93 N. W. (Wis.), 26.

Nothing is better settled, even where there is a sale of the property, instead of an executory sale, than that notice of the seller's purpose to resell must in some way be given. Meacham on Sales, par. 1634, and cases cited.

In the case at bar, immediately upon the refusal to pay the market price as fixed by the closing quotations, a right of action accrued to Herring for damages arising from the breach, but he did not thus terminate the contract, which was an election to keep the contract open and pass over the breach. *Roth* v. *Tayson,* 8 Ash., 120 (73 Law T. [N. S.], 628); *Ridgely* v. *Mooney,* 16 Ind. App., 362; *Indiana Canning Co.* v. *Priest, Id.,* 445; *Browning* v. *Simon,* 17 Ind. App., 45; *Lawrence, Etc.,* v. *Mercantile Co.,* 58 Kan., 77; *Diamond State, Etc.,* v. *R. R.,* 11 Tex. Civ., 587.

*William C. McLean,* for appellee and cross-appellant.

The failure of the appellant to pay for the cotton at its then actual *bona fide* market value—to wit, 9 13-16 cents per pound —was a breach of the contract, and thereupon it became liable to appellee for the difference in value between what it subsequently paid for the cotton—to wit, 9 cents—and its then actual value—to wit, 9 13-16 cents per pound. It is unnecessary to multiply authorities or to argue this question, for the rule seems

to be well settled by almost all of the authorities that "the vendor of personal property when the vendee has declined to take the property, and pay for it, ordinarily has the choice of any of three methods to indemnify himself against loss: First—He may store or retain the property for the vendee and sue him for the entire purchase price. Second—He may sell the property and recover the difference between the contract price and the price obtained upon a resale. Third—He may keep the property as his own and recover the difference between the market value at the time and place of delivery and the contract price." *Moore* v. *Potter,* 155 N. Y., 481 (s. c., 63 Am. St. Rep., 693, 694, and authorities cited and notes, pp. 697, 698, and authorities cited) ; *Grist* v. *Williams,* 111 N. C., 53 (s. c., 32 Am. St. Rep., 782, and notes).

This court held in *Planters Oil Mill Company* v. *Falls,* 29 So. Rep., 786, that as between seller and purchaser there is delivery when the goods are delivered to the carrier for transportation to the purchaser.

We contend that the sale of the cotton was completed and executed when the 242 bales were delivered to the Transportation Company at Vaiden, and the appellant was notified of this intention, and instructions were given by telegram that the cotton was that day sold, and we therefore contend that appellant was compelled to pay the actual *bona fide* market value, which was 9 13-16 cents per pound; in other words, the appellee fully complied with his part of the agreement, and the courts should make the appellant comply with its part of the agreement by making it pay the difference between what it actually paid and what it ought to have paid under the contract for the cotton. We call the court's special attention to the fact that the appellant was the only person to whom cotton put up into round bales could be sold; the appellant was the only person in the market for this class of cotton. The bill makes this allegation, and it is not denied in the answer; and in addition Herring testifies to this fact, and he is nowhere contradicted.

This is a very different case from where there is an executory contract of sale and where before the time fixed for delivery and before the vendor has appropriated any of the property on the contract the vendee countermands the order and thereby repudiates the contract. In which case quite a number of authorities hold that action for special damages for refusal to receive the property when the delivery was tendered is the proper action, and that the vendor must notify the vendee that he would sell the property for his account and hold him responsible for the difference between the contract price and the market value. But in this case the proof is clear that there was no market value at all for cotton put up in round bales (this is alleged in the bill and is not denied in the answer and is proved), there was no person except the defendant who would buy this cotton; the complainant was completely at the mercy of the defendant. He had to sell to the defendant or not sell at all. The defendant was bound to know of the existence of the fact that it was the only person in the market for this class of cotton. The defendant never declined to receive the cotton, but as a matter of fact did receive the cotton and actually advanced to the complainant the value of the cotton less 10 per cent discount upon a basis of 9 9-16, but when it settled with complainant in February, 1901, only allowed him 9 cents for the cotton. To say that complainant cannot sue for the difference between the value as fixed under the contract and the amount allowed to complainant by defendant would be to permit this trust to impose upon and defraud its licensees.

HARRIS,* Special Judge, delivered the opinion of the court.

This case is here on appeal and cross-appeal from a decree of the chancery court of Grenada county. The facts are as follows:

The American Cotton Company is a foreign corporation, and

---

*Chief Justice Whitfield being disqualified in this cause, excused himself, and J. B. Harris, Esq., a member of the Supreme Court bar, was appointed and presided in this case in his place.

the owner and patentee of a device whereby cotton is put up into what is known as the "round lap bales." On the 23d day of May, 1900, a contract was entered into between the American Cotton Company and L. W. Herring, of Vaiden, Miss., under which contract Herring agreed to install, and did install, the machinery of the company, as licensee, in connection with a gin plant, at Vaiden, Miss., to put up round lap bales. The contract, which is in evidence, is very voluminous, but only one provision is involved in this controversy, which is as follows: "The American Cotton Company hereby agrees that it will purchase from you during the cotton season ending March 1st, 1901, cotton properly put up in round lap bales on the presses of the American Cotton Company in accordance with your agreement dated May 23d, 1900, and to pay for same f. o. b. cars at Vaiden, Mississippi, at 12 cents per one hundred pounds below the actual *bona fide* market value in warehouse at Memphis, Tenn., for the same grade of cotton in uncompressed bales on the day of purchase. This price will ordinarily be based on the last official quotation of the day." Under this contract appellee, Herring, in the fall of 1900, began operations. On October 24, 1900, the American Cotton Company addressed a letter to Herring and its other licensees, in which it stated that it had found that the local quotations in Memphis and other points did not represent the actual *bona fide* market value of the cotton at the warehouses at such points for cotton in uncompressed bales, and that, "therefore, in accordance with the cotton agreement, we shall disregard such local quotations, naming instead thereof a basing limit that will represent the official *bona fide* market value in warehouses at such basing points for uncompressed bales. Actual market value ascertained through our close connections with other important cotton markets in the world shall be the basis of such limit. This limit will be figured on the most direct simple line of marketing. This makes no change either in the spirit or form of the cotton agreement. It simply supports a direct figure of actual *bona fide* market values

in warehouses at basing points for cotton in uncompressed bales on the day of purchase, instead of quotations which had been so handled that they do not." The letter also states that daily limits would be sent to the licensee of the company, and they were not so sent. Herring did not reply to this letter, but proceeded to put up round lap bales, and shipped to the company's depository in St. Louis fifty-eight bales of cotton to be held in storage, in accordance with other terms of the agreement, not important here to be mentioned. In the 5th of December Herring then having fifty-eight bales of cotton n the American Cotton C.'s. depository in St. Louis, sent the following telegram to the American Cotton Co. at Memphis, Tenn.: "Sell three hundred bales, including holdings, at closin gquotations." On the morning of the 5th, however, the cotton company had telegraphed Herring as follows, "Memphis middling basis limit 9 9-16;" this telegram having been sent in accordance with the terms of the letter of October 24th, above mentioned. The closing quotation, however, was 9 13-16 per pound. As before stated, Herring had on deposit at St. Louis fifty-eight bales, and on December 5th he loaded on the cars at Vaiden two hundred and forty-two additional bales, and shipped them to the St. Louis depository, andd rew a draft on the American Cotton Company for the value of the cotton based o nthe price of 9 13-16. This draft was dishonored. On December 5th the American Cotton Company wrote Herring as follows: "We are in receipt of your telegram saying sell three hundred, including holdings, at closing quotations." We replied: "Cannot accept at quotations. Can only accept sales basis *bona fide* value as construed by letters sent you. We now await your reply." Herring did not reply to this letter. On December the 13th the company wrote to the bank at Vaiden, through whom Herring had made draft for three hundred bales on the basis of 9 13-16, which had been rejected, in which it reiterated its intention to disregard quotations, and in which it stated it would be glad to purchase Herring's cotton at the limits mentioned in their telegram. After

this Herring wrote the following letter to Mr. Harvey, the manager of the cótton company at Memphis, dated December 21st: "The bank here is worrying me not a little about this cotton. If it suits you, you deduct 107 further and hold my cotton until further instructions. Let me know if this is satisfactory, and will forward matter. Yours truly, W. L. Herring. I will deduct ten and you deduct ten more." It is well to state that under the arrangement between the cotton company and the operators of its system, the licensee, upon shipping cotton to the company's depository, was given the privilege of drawing 80 per cent of the value of the cotton stored with the company. So Herring, on December 26th, after writing the letter above mentioned, drew a draft for the value of the two hundred and forty-two bales of cotton less 20 per cent, he having before that time drawn on the same basis against fifty-eight bales of cotton. On January 12, 1901, Herring sent the following telegram to the American Cotton Company: "Wire me Monday morning best offer on three hundred R.B.C. Memphis middling basis, and oblige." On January 14th the cotton company replied as follows: "In reply to your favor of the 12th we wired you best price on Memphis middling basis as requested." The three hundred bales of cotton referred to on December 5th were part of the three hundred and eighty bales referred to in the telegram of Herring on January 12th. On February 13, 1901, Herring sent the following telegram to the American Cotton Co.: "Five hundred bales and nine and one-fourth middling basis. Answer." The company replied on the same day as follows: "I am in receipt of your telegram reading as follows: "Five hundred bales at nine and one-fourth middling basis. Answer.' We replied: 'Telegram received. Cannot accept nine and one-fourth; our even limit nine and one-sixteenth.' " On February 6, 1901, Herring wired the cotton company as follows: "Sell five hundred bales cotton at 9 cents middling basis." This five hundred bales included all the cotton that Herring had on hand, including the three hundred bales referred to on De-

cember 5, 1900. On February 23d the cotton company wrote Herring as follows: "Please advise if you desire held all of the four hundred and sixty-four bales of cotton which you have on hand applied on the five hundred bales sale made us on the 16th. Please let us hear from you at once, as we desire to send you account sales for the number you wish to apply on that contract." To this Herring replied on the 25th: "I have shipped out today thirty-six R.B.C., making five hundred in all shipped this season and including the balance of five hundred sold the American Cotton Company. Please forward account sales at once." The account sales were all forwarded to Herring on February 16th. It therefore appears that after the shipment of the two hundred and forty-two bales on the 5th, Herring shipped to the depository in St. Louis two hundred additional bales, making five hundred, which he ordered sold at 9 cents on February 16th. It is shown that on February 16th the closing quotations were 9 1-8. The company was offering 9 cents per pound, and Herring ordered the sale at 9 cents. The record shows that subsequent to the transaction of February 16th Herring made shipments, but they do not enter into this controversy. In rendering an account sales the cotton company charged Herring with interest on the money advanced on the fifty-eight bales of cotton from the date of the draft on the fifty-eight bales of cotton. It charged Herring with interest on the money advanced on two hundred and forty-two bales of cotton from the date of the draft for that cotton. It charged him storage, and aso insurance, for the time the cotton was on hand until February 16, 1901, when the company claimed the sale was made.

On September 13, 1902, Herring filed his bill in the chancery court of Grenada county (he having at that time ceased to do business with the cotton company) against the American Cotton Company and Bowen Bros. & Leverett, the latter being residents of the state of Mississippi. The bill alleges that the American Cotton Company was a foreign corporation, and

had property in the hands of Bowen Bros. & Leverett in Grenada county, which consisted of the round lap outfit belonging to the American Cotton Company, the bill being a chancery attachment. The bill set up the contract above referred to, and alleged a breach of the same, claiming that a sale of the three hundred bales of cotton was made on December 5, 1900, at 9 13-16 per pound—the three hundred bales of cotton weighing 78,960—and claiming that the company was due him the difference between nine cents and 9 13-16 cents. He further claimed that the company had made an overcharge of interest on the fifty-eight bales of cotton as to all interest subsequent to the 5th day of December, 1900, and up to the 16th day of February, 1901; that it had made an overcharge of insurance for the same time and an overcharge of storage for the same time; that it was not entitled to any amount of storage or insurance on the two hundred and forty-two bales of cotton shipped on December 5th, or for interest on same advanced on that cotton; and, furthermore, that the company should have paid Herring for the two hundred bales shipped subsequent to December 5th, instead of 9 cents per pound, 9 1-8 cents—in other words, that on the two hundred bales of cotton, amounting to 53,775 pounds, the cotton company was due under the contract one-eighth cent per pound.

An answer was filed by the American Cotton Company denying that there was a sale of cotton on December 5th as claimed; denying that there was an overcharge in insurance, storage, or interest; alleging that there was no sale of cotton until February 16, 1901, at which time the cotton was sold for the complainant and on his order at 9 cents per pound.

It was shown that the American Cotton Company was the only buyer of round lap bales. There was no one else in the market for such cotton. It was also admitted that on December 5, 1900, the American Cotton Co. was in the market for cotton, and offering on that day to pay 9 9-16 cents per pound. It may also be taken as established by proof that the actual

market value of cotton in uncompressed bales in Memphis on December 5, 1900, was 9 13-16; and it is also shown that on February 16th closing quotations were 9 1-8.

The chancellor decreed that the complainant was entitled to recover of the cotton company the difference between 9 cents per pound, the price at which the cotton was actually sold on February 16th, and 9 13-16, the closing quotation on October 5, 1900—in other words, that he was entitled to recover thirteen-sixteenths of a cent on 78,960 pounds, being the three hundred bales of cotton claimed to have been sold on December 5th. He also decreed that the cotton company had made an overcharge of interest, insurance, and storage on fifty-eight bales of cotton alleged to have been sold on December 5, 1900, and that the cotton company was not entitled to charge any interest, storage, or insurance on the two hundred and forty-two bales of cotton shipped on December 5, 1900. He further decreed that the complainant was not entitled to recover the difference between 9 cents and 9 1-8 cents on the two hundred bales of cotton sold on February 16, 1901. He further held that the complainant was not entitled to an allowance of $86.54, being 11 points allowed complainant on the sale of three hundred bales of cotton. He also disallowed the claim of complainant for $49, an alleged overcharge in insurance. It should be explained here that the item of $86.54, being an allowance of 11 points disallowed complainant in the chancery court, was claimed to be an allowance made by the American Cotton Company of 11 points for the purpose of equalization of prices as between the non-compressed and round lap bale. At all events, on the account of sales rendered the complainant on February 16, 1901, this allowance was made on the whole five hundred bales of cotton. From this decree the American Cotton Company appealed, and the complainant took a cross-appeal as to the items disallowed by the chancellor.

We are of the opinion that the decree must be reversed. In no view of the case, under the facts disclosed in this record, was

the complainant entitled to recover the difference between 9 cents and 9 13-16 cents on the three hundred bales of cotton claimed to have been sold on December 5, 1900. He could only recover the difference between 9 9-16 and 9 13-16 in any view. He could have taken the 9 9-16 and sued for the difference, or completed the contract on his part, and received the contract price, the actual value of the compressed cotton. Should we find that there had been a breach of the contract between the cotton company and the complainant, the rule seems to be settled that there were three methods of arriving at a proper measure for damages on a breach of contract of this kind : (1) The seller may complete the contract on his part, and recover the contract price. (2) He may treat the contract as ended, retain the property as his own, and sue for the difference between the market value of the cotton and the contract price.    (3) He may sell the property at public or private sale for the best price he can obtain, and sue for the difference between the price realized and the contract price.    The rule is set forth in Benjamin on Sales (6th ed.), pp. 744, 776 ; also in Tiedman on Sales, sec. 333 *et seq.; Dobbins* v. *Edmonds,* 18 Mo. App., 307 (63 Am. St. Rep., 692, 697). The complainant adopted none of the three methods which we have pointed out.    While it is true that the American Cotton Company was the only purchaser of round lap cotton, at the same time it was shown beyond controversy that it was in the market for cotton, and was ready to pay instantly on December 5th 9 9-16 cents per pound for the complainant's cotton ; was offering that price to the complainant.    The complainant was fully protected by his contract, and he could have demanded and recovered from the complainant the actual *bona fide* market value of the cotton on each and every day that he had cotton to sell.    The complainant, however, did not stand upon his contract.    He did not notify the cotton company that he would stand on his contract, and demand the thirteen-sixteenths and disregard their letter of October 24th, in which he was notified that the company would no longer be governed by

quotations, but would fix the actual market value on a different basis. On the contrary, the complainant treated the cotton as being stored for his account, and drew draft for 80 per cent of its value, as fixed by the cotton company's limits as outlined in their letter of October 24, 1900. It will be borne in mind that the contract made with the complainant provided that ordinarily the closing quotations would be taken as basis in ascertaining the actual *bona fide* value of cotton; but the contract did not say that closing quotations would be absolutely taken, and this left the cotton company in a position to change the basis; but, whether or not it changed this basis of estimating the actual value, it could not, under the contract, at any time compel the complainant to take less than the actual value, whatever basis it might adopt at arriving at that value. During the life of the contract the complainant could compel the cotton company to take his cotton at 12 cents per 100 pounds less than the actual value of uncompressed cotton in the warehouse at Memphis. If, on December 5th, the actual value of uncompressed cotton in the warehouse at Memphis was 9 13-16 cents per pound, the complainant could have compelled the cotton company to pay him that for his cotton, regardless of its efforts to change the basis of estimating the value or of "limits" fixed by it. The complainant, however, did not elect to stand upon his contract. He recognized the limits fixed by the cotton company, drew on it for 80 per cent value of three hundred bales of cotton, left some in the warehouse in St. Louis on deposit, and continued to refer to it in his letters and telegrams and deal with it as his (complainant's) cotton, and on February 16, 1901, directed the company to sell the cotton at 9 cents middling basis, which was done, and an account sales rendered as of that date. We are clear, therefore, that the complainant is not entitled to recover the difference between 9 cents and 9 13-16 cents under any view. But we are further of the opinion that the complainant is not entitled to recover anything on account of the three hundred bales of cotton. He clearly waived his rights under the

contract. He treated the cotton as his own. Not only did he never notify the company that he intended to stand on his contract; but, on the contrary, he dealt with it, with his letter of October the 24th before him, without decling to accept the terms of the letter, but on the contrary, acting in accordance with it.

We are not holding that the company had the right to break its contract with complainant, or to materially modify it, without his consent; but it had notified complainant of the intended modification of the contract, and the complainant made no protest, but continued to deal with the company on the line of their notification to him of the modification, and he is bound by his acts. There was no way for the company to get away from its contract with the complainant without being liable to it according to its terms, unless he consented or waived his rights under the contract; and we think in this case that he clearly waived his rights under the contract. Therefore we hold that the cotton company was entitled to charge the complainant storage, insurance, and interest, as was shown by the record, on the three hundred bales of cotton, made up of fifty-eight bales in storage December 5, 1900, and two hundred and forty-two bales shipped on that day.

In regard to the claim of one-eighth of a cent per pound on two hundred bales of cotton sold on February 16, 1901, we think the decree of the chancellor was correct. The complainant directed the cotton sold at 9 cents. He again waived his rights under the contract, and accepted 9 cents per pound for the cotton, when he could have stood upon his contract; and if 9 1-8 was the actual *bona fide* market value of uncompressed cotton in warehouse at Memphis on February 16th, by the terms of the contract he could have received that sum; but he did not stand on the contract.

It is useless to talk about the American Cotton Company being the only buyer of such cotton as the complainant was offering, or that the complainant was at its mercy and had to accept what it offered. He did not have to accept this unless he waived

his rights under the contract. He was protected by the contract, and there is no pretense that the cotton company was not amply able for damages for its breach.

In regard to the item of $86.54, being the 11 points allowed on three hundred bales of cotton, we are unable to see by what theory the chancellor arrived at the conclusion that the complainant was not entitled to this allowance. The cotton company was not demanding it. The point does not seem to have been raised at all. It was allowed to complainant on settlement for the cotton, and he was entitled to it. We do not find in the record that the cotton company was demanding this payment, nor is it claiming it here, and therefore the decree upon this point is erroneous.

Our conclusion is that the decree of the chancellor on the direct appeal should be reversed. On the cross-appeal the decree should be reversed as to the item of $86.54, but affirmed in all other respects, and decree here dismissing the bill.

*Reversed and decreed here.*