For the foregoing reasons it is hereby ORDERED that Defendant's motion to dismiss be and the same is hereby, denied.

Defendant has ten (10) days from and after receipt of this Order to serve upon the Court a responsive pleading.

CASTLE FABRICS, INC., Plaintiff,

v.

FORTUNE FURNITURE MANUFAC-TURERS, INC., Defendant.

No. EC 77–17–K–P.

United States District Court,
N. D. Mississippi, E. D.

Nov. 7, 1978.

George E. Morrow, Memphis, Tenn., William C. Murphree, Tupelo, Miss., for plaintiff.

John D. Sibley, Okolona, Miss., for defendant.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

In this diversity action, Castle Fabrics, Inc. (Castle), a Tennessee corporation, sues Fortune Furniture Manufacturers, Inc. (Fortune), a Mississippi corporation, for $23,088.90 plus accrued interest for unpaid invoices of upholstery fabrics shipped by Castle to Fortune. In addition, plaintiff seeks to recover $656.95 for discounts improperly taken by Fortune on late payments of other invoices. Fortune, by its answer, admitted that it ordered fabrics from Castle which were delivered to defendant's furniture plant at Okolona, Mississippi, but contended that plaintiff had overshipped goods to it, that defendant revoked acceptance of the overshipped goods and returned them to Castle, for which credit was allowed, and Fortune paid the

balance of the account. Alternatively, Fortune pleaded the statute of frauds as an affirmative defense.

## I. FINDINGS OF FACT

At the pretrial conference before the U. S. Magistrate, it was stipulated that Fortune, which was engaged in manufacturing a line of upholstered furniture, had done business with Castle as a fabric supplier since 1972; these dealings continued until September 1976. Between the dates of May 11 and June 14, 1976, Castle shipped and invoiced to Fortune 480 rolls, or pieces, of fabric varying in length from 50 to 75 yards. These shipments, which form the main core of the present controversy, are evidenced by six particular invoices:

08447 for 38 pieces 08603 for 79 pieces
08500 for 64 pieces 08665 for 148 pieces
08563 for 94 pieces 08711 for 57 pieces

Fortune received each shipment and placed the material in its Okolona warehouse. Sidney Whitlock, Fortune's president, first complained on June 22, 1976, to Sam Morris, Castle's salesman, that he had been shipped "610 rolls of goods he didn't order," but nevertheless said "he would meet with somebody at the [furniture] show in Dallas to work something out." About a week or ten days prior to July 27, Whitlock telephoned Guthrie Castle, plaintiff's president, complaining of overshipment of goods. Plaintiff's president, accompanied by Morris, met Whitlock at the latter's plant on July 27, when Whitlock reiterated that he had been overshipped. This was denied by Guthrie Castle, who stated that he wanted payment on the past due invoices. At this conference, plaintiff did, however, agree to reduce the price of the material. Beyond that, a factual dispute arises as to whether the parties reached an understanding as to the disposition of the disputed fabrics. Whitlock repeated that he would endeavor to move the material by offering to his customers a reduced price on furniture items to be upholstered with the material, but that if they could not be disposed of in this manner, he expected to return them to Castle. Guthrie Castle denied that he agreed that Fortune might return the material or that he ever authorized return shipments which would relieve Fortune of its obligation as buyer. On August 3, Guthrie Castle again visited Whitlock, who stated he was trying to dispose of the fabric.

Whitlock was unsuccessful in his efforts to move all fabric to his jobber-customers, notwithstanding the reduced price of the material. On September 1, Fortune shipped, by motor carrier, 360 pieces of this material, valued at $38,598.90, to Spartanburg, South Carolina, the point from which it has originally been shipped. On or about September 15, Fortune shipped 57 pieces to Castle at its plant in Memphis; Castle refused to accept this shipment, and the motor carrier returned it to Fortune. On October 22, Fortune returned to Castle an additional 95 pieces of fabric, valued at $10,274.56; this particular shipment was accepted by Castle.

The evidence shows that in 1975, after beginning their business dealings, Castle undertook to supply, through its affiliate mill, Carpostan Industries located at or near Spartanburg, two new patterns of fabric, known as Aruba and Eagle, to meet the requirements of Fortune, which furnished swatches of similar material that Fortune was then buying from Chicopee, another supplier. Thereafter, Fortune placed a series of orders for a total of 1790 pieces of the specially manufactured fabric upon oral orders to Morris, the salesman; Castle then issued purchase orders to Carpostan with instructions to ship directly to Fortune at Okolona. Confirmation of each order was sent to Fortune. The following purchase orders were filled by Castle:

1. Order No. 10065 dated June 25, 1975, for 300 pieces.

2. Order No. 10093 dated August 14, 1975, for 100 pieces, but this order, according to Castle, was raised to 200 pieces by telephone instructions from Whitlock and his agents given October 29 and 30, 1975.

3. Order No. 10115 dated September 24, 1975, originally for 100 pieces, which, according to Castle, was increased by Whit-

lock by telephone instructions on October 29, 1975, to 220 pieces.

4. Order No. 10136 dated October 19, 1975, for 420 pieces.

5. Order No. 1428 dated April 7, 1975, for 300 pieces.

6. Order No. 10212 dated Feb. 2, 1976, for 350 pieces.

Whitlock conceded that he ordered the original amounts but denied that he authorized any increases. He also denied, in its entirety, any authorization for the last mentioned purchase order. Whitlock therefore disputes that he authorized shipment of 570 pieces of the Aruba and Eagle material. Whitlock also took the alternative position that when plaintiff made only partial shipments on the purchase orders, the balance was automatically cancelled. Plaintiff's position is, of course, that Fortune's agents authorized the total shipments delivered to Fortune. Guthrie Castle stated it was not unusual in the fabric industry for a mill to make a series of partial shipments to fill an order, and his company's personnel maintained detailed records, which were introduced in evidence, to show how each order was completed by particular shipments to Fortune. Fortune maintained no records other than Castle's invoices and bills of lading from the motor carrier. Neither did Fortune measure the yardage in the rolls, but relied upon quantity statements shown on Castle's invoices. Whitlock, acknowledging that his plant had no records of fabrics received from Castle, maintained he could determine the yardage from the quantity of production of chairs, recliners and other items of upholstered furniture, inasmuch as he knew what yardage was required for the manufacture of each article. From this conflicting evidence we find that Fortune ordered the fabric shipped by Fortune, that no overshipments occurred, and that it was customary in the industry for orders to be filled by partial shipment from the mill.

Of the six invoices which form the principal dispute in the case, two of them, 08447 and 08711 covering 95 pieces with an aggregate value of $10,297.75, were factored, or discounted, by Castle with the First National Bank in Dallas, Texas. By this manner of financing, Castle, upon maturity of the invoices, would be paid by the bank less a discount fee, and the bank would look to Fortune for payment. The remaining four invoices were not factored but held by Castle for 360 pieces having an aggregate value of $42,184.07. The total value of the disputed goods, both factored and unfactored, was $52,481.82.

After Fortune returned to Castle the initial quantity of 360 pieces, it received a credit memorandum dated September 28, 1976, for $38,587.66 (Deft. Ex. 3). In the interval between the July 27 conference between Guthrie Castle and Whitlock, there had been various calls regarding Fortune's inability to move the fabric to its jobber-customers, but nothing else was said by either about returning the material. Although Guthrie Castle did not expressly authorize reshipment, nevertheless, upon learning that Fortune had returned the goods to a warehouse in Spartanburg, he objected only on the ground that the goods should have been sent to Memphis. Neither Guthrie Castle nor plaintiff's other agents made any representations to Fortune different from that indicated by the credit memorandum, or advised Fortune that the credit memorandum was an error and the goods would be resold at the best price obtainable for Fortune's account.

Meanwhile, after the two factored invoices had matured and were not paid, Bethel Steward, account executive of the First National Bank in Dallas, had telephone conversations with Whitlock who, relying on his claim of overshipment, was contending that he was due further credit for returned goods, and also with Guthrie Castle who advised the banker that a complete statement of the transactions between Castle and Fortune would be forthcoming, and that such statement would show that Fortune still had in its possession goods which were not paid for. Guthrie Castle realized that the bank would rely upon this statement in its efforts to collect from Fortune.

As stated, Fortune on October 22 had returned 95 pieces of fabric to plaintiff;

these pieces valued at $10,274.66 were received by plaintiff, but no credit memo had ever issued to Fortune. Guthrie Castle testified at trial that he authorized the return of this material under the impression that it had been factored to the bank, but upon checking the returned fabric it was ascertained that of the 95 returned pieces only $1,788 of value was covered by the bank-factored invoices. Castle failed to notify Fortune that it would allow credit for only the factored portion of the 95 pieces, and hold the unfactored pieces for resale for the account of Fortune.

After Fortune's return of the 95 pieces, Steward several times contacted Whitlock by phone, and was advised that Whitlock had not received all credits due by Castle and was waiting to obtain that information before he would pay the bank. Steward advised Guthrie Castle of Whitlock's position. It was at this juncture that Guthrie Castle proceeded to prepare, and deliver to Steward, a summary of all transactions with Fortune. On November 24, Steward telephoned Whitlock that he had obtained from plaintiff a statement of the unpaid invoices and the fabric returned for credit. On November 26 he forwarded to Whitlock a letter listing Castle's unpaid invoices in the total amount of $52,481.82, deducting 360 pieces returned September 1, for $38,-590.90, and 95 pieces returned October 22, for $10,274.66. According to Steward, this left Fortune owing an unpaid balance of $3,616.36 on Castle's invoices.[1] Upon receipt of Steward's letter, Fortune remitted to the bank the sum of $3,616.36 and regarded the entire Castle account cleared.

After this payment was made, Castle authorized the bank to charge its reserve account with a balance of $6,681.39 which Castle acknowledged was still owing to the bank on the two factored invoices. The evidence shows that in case of a dispute between Castle and its customer, the bank had recourse on Castle on all disputed factored items. Hence, the charge-back was agreed to by Castle to get the bank out of the remaining controversy which Castle had with Fortune. Guthrie Castle testified that he was unaware of the bank's letter and accompanying statement sent to Fortune on November 26 (Deft. Ex. 4), and that no credit had been intended, or in fact been given, to Fortune on any of the returned merchandise.

Guthrie Castle testified that the credit memorandum for $38,587.66 was a record intended solely for internal company purposes to account for the returned merchandise as part of its inventory, and the memorandum was erroneously sent to Fortune. He stated that he had given explicit instructions to his office personnel not to release the credit memo to Fortune and was unaware that such had occurred until after the present suit was filed and his discovery deposition was taken on October 31, 1977. Plaintiff's recordkeeping had been totally computerized for some years by John J. Lux, a Memphis CPA, with all underlying data prepared at Castle's office and fed into a computer at an off-premises location. Lux recalled that in the latter part of 1976 Guthrie Castle raised with him the problem of how to handle Fortune's fabrics which had been received into inventory. Castle did not state that the buyer had returned the goods without authority. Lux advised Castle that the correct procedure was to reverse the original invoices, that is, to use the same as a credit memo which would account for the material in inventory and make necessary adjustments to commissions previously paid to salesmen on returned merchandise. Lux acknowledged, however,

---

1. The letter, prefaced "Dear Sid," reads as follows:

"Per our telephone conversation of Wednesday, November 24, 1976, please find enclosed a breakdown of the unpaid invoices and merchandise that was returned *for credit*. (Our emphasis).

"If you have any questions on this, please call me at the number listed above."

The enclosure to the letter totaled the Castle unpaid invoices, and subtracted the separate total amounts for merchandise returned on September 1, 1976 and October 22, 1976, to arrive at an unpaid balance of $3,616.36. Deft. Ex. 4.

that in the normal course of business several hundred credit memos had been issued and released to Castle's customers. The accountant disclaimed any responsibility for permitting the credit memorandum to be released to Fortune, stating that such memos are usually handled by plaintiff's personnel. Oran Rodgers, Castle's vice-president, testified he was aware that the credit memo on Fortune's returned goods of 360 pieces was merely to account for the material being in inventory and was not intended to be a credit allowance to Fortune. He also confirmed Guthrie Castle's statement that the internal records for such credit were split into two months: one for $21,000 backdated August 31, and the other for $17,587.66 dated September 28; that this was done for the purpose of not charging the entire sum against salesmen commissions in one month and also to make the company's September operations look better. Rodgers testified that Guthrie Castle gave specific orders to Mr. Perry, the secretary-treasurer, not to release the credit memo to Fortune. On cross-examination, Rodgers acknowledged that in many instances goods have been returned to Castle for which genuine credit memos issued, but that in none of these cases were the returned goods placed in inventory because of defects or other special conditions. He conceded that the credit memo issued to Fortune was on a form which Castle would usually use in granting bona fide credit memos in the usual course of business.

The undisputed evidence was that none of Castle's personnel ever notified Fortune that the credit memo was erroneously issued for the 360 pieces and that plaintiff, in fact, proposed to resell the returned goods for the account of Fortune. Neither did Castle advise Fortune that the 95 pieces last returned to and accepted by Castle would not be credited to Fortune's account, but held for resale.

Although Guthrie Castle denied that he agreed for Fortune to return fabrics which it could not dispose of at the reduced price, the preponderance of the evidence convinces us that such an agreement must have been reached with Fortune, as borne out by Castle's acts, and failure to act, in its dealings not only with Fortune but also with the bank. When Castle's entire conduct is judged by reasonably objective standards, it fails to support, and indeed is inconsistent with, Guthrie Castle's version of the transaction. Moreover, we conclude that Fortune, under circumstances induced by Castle, would not have surrendered the fabric except in fair expectation that it would receive full credit therefor; and because of its strained financial condition, Fortune would hardly have risked the substantial loss incident to returning the material without credit and permitting it to be resold for its account as buyer.

Castle disposed of the returned merchandise at reduced prices and as close-out items, the Aruba and Eagle patterns not being standard stock. Castle sustained a loss of $13,971.86, the difference between the invoice price to Fortune and the amount realized upon resale. In addition, plaintiff incurred incidental costs of transportation of $1,268.99, factoring expenses of $638.54, sales commissions on resale $968.13, and handling costs of $2,348.13. Plaintiff seeks to recover $19,195.65, principal, plus accrued interest. In addition, plaintiff sues to recover discounts of $656.56 which Fortune concededly improperly took on late payments.

## II. CONCLUSIONS OF LAW

■ Since the court has previously found that the disputed shipments conformed to oral orders for the fabric placed by Fortune,[2] it follows that Fortune's revocation of its prior acceptance of the fabric was wrongful as against Castle, Miss.Code Ann. § 75-2-608 (1972), and Castle was thereafter entitled to the remedies provided a seller by § 75-2-703. The issue thus presented for resolution by the court is whether Cas-

2. Fortune's counsel conceded at trial that § 75 2 201, the statute of frauds governing the sale of goods, was satisfied since the fabric was specifically manufactured for Fortune and was not suitable for sale to others in the ordinary course of Castle's business, § 75-2-201(3)(a).

tle's post-breach conduct—i. e., agreeing to allow a discount on the disputed pieces of fabric, accepting the 360 pieces returned to Spartanburg and sending a credit memorandum to Fortune with no qualification as to its meaning either contemporaneously or subsequently, and representing to the First National Bank in Dallas that the dollar amount of the credit memo and the credit given for the 95 pieces returned to Memphis were no longer disputed—should be construed as an acquiescence in the agreement which Fortune alleges was made between the parties after the initial breach.

■ The Uniform Commercial Code, as adopted in Mississippi, provides that

Unless the contrary intention clearly appears, expressions of "cancellation" or "rescission" of the contract or the like shall not be construed as a renunciation or discharge of any claim in damages for an antecedent breach.

§ 75–2–720. Although the Mississippi Supreme Court has not considered this section, it has been interpreted to mean that no waiver of an aggrieved party's right to recover damages for a prior breach should be presumed absent express language that the cancellation or rescission is "without reservation of rights" or the like. Comment, U.C.C. § 2–720; 67 Am.Jur.2d § 516, at 696. However, the code also makes clear, through § 75–1–203, the obligation of both parties to a contract to exercise "good faith in its performance *or enforcement,*" (emphasis added), and states that it is to be supplemented, unless particularly displaced by its own provisions, by "principles of law and equity, including . . . the law relative to . . . estoppel . . . ." § 75–1–103. After a thorough examination of the facts and circumstances of the entire transaction between the parties after the breach, the court is convinced that Castle engaged in a course of conduct inconsistent with the rights afforded a seller upon the buyer's breach. Castle's failure to exercise diligence in enforcing its rights under the contract and instead electing a course of conduct which was, at best, seriously misleading to Fortune, operates in this instance

to estop Castle from now asserting that it is entitled to those rights which it abandoned when it did not stand on its contract.

■ The first occurrence subsequent to Fortune's breach which demands examination is Castle's undisputed granting of a discount to Fortune at the July 27 meeting for the pieces of fabric claimed to have been overshipped. Such a concession, offered as an inducement to a buyer to retain allegedly defective goods, has sometimes been considered an admission by the seller as to the defective condition of the goods and a waiver of certain restrictive contractual clauses concerning the return of goods by the buyer. See *Viking Refrigerators v. Farrell,* 180 Miss. 181, 176 So. 910, 913 (1937); *J. A. Fay & Egan Co. v. Louis Cohn & Bros.,* 158 Miss. 733, 130 So. 290, 292 (1930). Castle argues that the discount was granted merely in the spirit of maintaining a good business relationship and that such concessions for the sake of public relations should not be arbitrarily construed against a seller who has been wronged in the first instance. The court agrees that a good faith attempt to iron out problems in an otherwise solid business relationship should not, standing alone, deprive an injured seller of its statutory remedies. In this case, however, the discount does not stand alone, and it was, in fact, only the first in a series of acts by Castle which make its intentions appear at least doubtful and at most supportive of Fortune's position.

After the meeting at which the discount was agreed upon, the next legally significant event was Fortune's return of the 360 pieces of fabric to Spartanburg when it was unable to move the fabric at reduced prices. The court has already found that Guthrie Castle agreed to this arrangement at the July 27 meeting, and the following course of conduct by Castle strongly supports such a finding. First, upon the arrival of the fabric in Spartanburg, Guthrie Castle objected to Fortune, not that the fabric had been wrongfully *returned,* but that it had been shipped to the wrong *place.* Castle's next communication with Fortune was the mailing of the credit memorandum showing

full credit given for the returned fabric. Castle did not in any way qualify the meaning of the memorandum by notifying Fortune of a conditional acceptance of the goods only for resale for Fortune's account. It is also noteworthy that Guthrie Castle never characterized the return of the goods as being without authority or wrongful in any way in his communications with Lux, Castle's own CPA, or with the First National Bank in Dallas.

 Castle now argues that the issuance and delivery of the credit memorandum to Fortune should be given no legal effect since it was a clerical error made in the face of explicit, contrary instructions to its office personnel. It is a well-settled principle of agency that the actions of an agent, taken within the scope of his authority, either real or apparent, are binding on his principal for purposes of liability to third persons. *Cue Oil Co. v. Fornea Oil Co.*, 208 Miss. 810, 45 So.2d 597, 599 (1950); 3 Am.Jur.2d (Agency) § 261, at 626 (1962); 3 C.J.S. Agency § 390, at 217 (1973); Restatement of Agency 2d § 8A (1958). This is so even when the agent disregards contrary instructions by the principal if the person with whom the agent is dealing reasonably believes the agent has authority to so act and has no notice of a lack of such authority. 3 Am.Jur.2d (Agency) § 263, at 628 (1962); 3 C.J.S. Agency § 390, at 219 (1973); Restatement of Agency 2d § 161 (1958). In the case sub judice, Fortune certainly had no notice that Castle's agents had been instructed not to issue the credit memorandum and that its delivery was erroneous. Furthermore, testimony in the case established that Castle, through its office personnel, customarily issued credit memoranda for returned merchandise, albeit defective or otherwise unsuitable to the buyer. Fortune could reasonably have been expected to take the credit memorandum, admittedly issued by Castle's agents, at face value and rely on its contents in settlement of its accounts. Castle, therefore, is bound by the representations contained in the erroneously issued memorandum. Nor are we impressed with Guthrie Castle's claim that he remained ignorant of the credit memoran-

dum since it was readily ascertainable upon a search of his own company's records.

The same result obtains with regard to the subsequent shipment of 95 pieces of fabric to Memphis, there accepted by Castle. Guthrie Castle acknowledged that he authorized the return of this fabric but stated that he did so only because he was under the impression that all of the fabric had been factored through the Dallas bank. The evidence, however, does not show that such an understanding was ever communicated to Fortune, either before or after the fabric was returned. Furthermore, after Castle discovered that, in fact, only a portion of the returned fabric had been factored, no objection was made to Fortune, nor did Castle notify Fortune of its intent in retaining the goods, either factored or unfactored. No credit memorandum was issued for any portion of this fabric, nor did Castle notify Fortune that it did not wish to accept the goods or that it accepted them only to hold them until resale for Fortune's account or for any other reason. As a consequence, Fortune continued to entertain a reasonable belief that full credit was to be given for the returned pieces accepted by Castle.

 Fortune's understanding of this situation was, necessarily, reinforced by the figures, showing full credit for the return of not only 95 pieces, but also 360 pieces, which Guthrie Castle supplied the Dallas bank with full knowledge that his calculations would be used by the bank in settling its account with Fortune. Since Fortune was aware that Steward had consulted extensively with Guthrie Castle and that Steward, in computing the unpaid balance of $3,616.36, relied exclusively on figures supplied by Castle himself, and since no distinction was ever made to Fortune by Castle or the bank between credit or payment for factored or unfactored invoices, it was inevitable that Fortune would conclude that the bank was acting as an agent for Castle, as principal, in collecting the entire unpaid balance on the disputed account. The Mississippi Supreme Court has said re-

peatedly that "[a] principal, having clothed his agent with the semblance of authority, will not be permitted, after others have been led to act in reliance of the appearance thus produced, to deny, to the prejudice of such others, what he has theretofore tacitly affirmed as to the agent's powers." *E. g., McPherson v. McLendon*, 221 So.2d 75, 78 (Miss.1969). We think it clear in this instance that the bank was acting as Castle's agent for collection of at least the factored invoices, and that Castle's previously described conduct broadened the bank's scope of apparent authority to such a degree that the bank became Castle's agent for final collection. Bethel Steward's quotation of $3,616.36 as the total balance due on the Castle account was therefore binding on Castle.

The Mississippi Supreme Court has held in an analogous case that a seller who, after notification that the buyer did not intend to comply with the original terms of a written contract, failed to notify the buyer that he intended to stand on the contract as written, clearly waived his rights under that contract. *American Cotton Co. v. Herring*, 84 Miss. 693, 37 So. 117, 120 (1904). Because the seller did not decline to accept the buyer's new terms and acted instead in accordance with them, he could not be said to have stood upon his original agreement. The Court said:

> We are not holding that the [buyer] had a right to break its contract with complainant, or to materially modify it, without his consent; but it had notified complainant of the intended modification of the contract, and the complainant made no protest, but continued to deal with the [buyer] on the line of [its] notification to him of the modification, and he is bound by his acts. There was no way for the [buyer] to get away from its contract with the complainant without being liable to it according to its terms, unless he consented or waived his rights under the contract; and we think in this case he clearly waived his rights under the contract.

*Id.*; *see also Viking Refrigerators, Inc. v. Farrell*, supra.

Although both of the above cases were decided before adoption of the Uniform Commercial Code in Mississippi, we do not believe that their holdings have been eviscerated by the code. For the code, with all its thoroughness, still does not, and cannot, specifically address every set of circumstances that might arise in the course of a business transaction. It does not specifically address a situation such as the one presented here, where even though the aggrieved party does not sign a waiver or clearly agree to a rescission after a breach, his conduct cannot be construed as anything other than a waiver of his right to recover for the breach. It is worthy of note that § 75–1–203 forcefully imposes an obligation on the parties to a contract to exercise good faith in its enforcement. The court is convinced that Castle's chosen course of conduct in this case, even though it may not have been calculated to deceive, nevertheless materially misled Fortune into believing that it intended to allow full credit for all fabric which Fortune could not itself sell. If Castle intended to enforce its contract in good faith, it was obligated to exercise diligence in the preservation of its right against Fortune to recover damages for the buyer's breach by standing firmly on the rights granted by § 75–2–703.

■ Concluding that Castle effectively waived its right to recover damages for Fortune's breach, Castle may prevail only on its claim for discounts improperly taken by Fortune.

Let Judgment be entered accordingly.